**Slip Op. 04-11**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: SENIOR JUDGE NICHOLAS TSOUCALAS**

_____ :
                                            :
NTN CORPORATION, NTN BEARING                :
CORPORATION OF AMERICA, AMERICAN            :
NTN BEARING MANUFACTURING                   :
CORPORATION, NTN DRIVESHAFT, INC.,          :
NTN-BOWER CORPORATION and NTN-BCA           :
CORPORATION,                                :
                                            :
                    Plaintiffs,             :
                                            :
               v.                           :      Court No.
                                            :      00-09-00443
UNITED STATES,                              :
                                            :
                    Defendant,              :
                                            :
               and                          :
                                            :
TIMKEN U.S. CORPORATION,                    :
                                            :
                    Defendant-Intervenor.   :
_____ :


     Plaintiffs, NTN Corporation, NTN Bearing Corporation of America, American NTN Bearing Manufacturing Corporation, NTN Driveshaft, Inc., NTN-Bower Corporation and NTN-BCA Corporation (collectively "NTN"), move pursuant to USCIT R. 56.2 for judgment upon the agency record challenging the United States Department of Commerce, International Trade Administration's ("Commerce") final determination entitled <u>Final Results of Antidumping Duty Administrative Reviews and Revocation of Orders in Part on Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Romania, Singapore, Sweden and the United Kingdom</u> ("<u>Final Results</u>"), 65 Fed. Reg. 49,219 (August 11, 2000).

     Specifically, NTN contends that Commerce erred in: (1) restating NTN's home-market and United States inland freight expenses and unjustifiably applied facts available; (2) using adverse facts available margins for United States sales of NTN models compared to sales to home-market affiliates; (3) including export price ("EP") sales in its calculation of the constructed

export price ("CEP") profit adjustment; (4) not calculating CEP profit on a level-of-trade ("LOT") basis; (5) recalculating NTN's home-market inventory carrying costs and refusing to adjust normal value ("NV) for all home-market commissions; (6) reallocating NTN's United States and home-market selling expenses without regard to LOT; (7) including NTN'S sample sales and sales with allegedly abnormally high profits in the calculation of NV and constructed value ("CV") profit; (8) making adjustments to NTN's cost of production ("COP") and CV; and, (9) failing to use CV after disregarding below-cost sales from the calculation of NV.

**Held:** NTN's motion for judgment on the agency record is granted in part and denied in part. Case remanded to Commerce to: (1) apply it arm's length test, in accordance with 19 C.F.R. § 351.403(c) (1999), to the sales prices of the two affiliated resellers; (2) explain how the record supports its decision to recalculate NTN's home-market indirect selling expenses without regard to LOT; and (3) clarify the reasoning for Commerce's treatment of inputs, and (a) apply the major input rule where appropriate, and (b) open the record for additional information, if necessary.

[NTN's 56.2 motion is granted in part and denied in part. Case remanded.]


                                        Date:      February 3, 2004


     Barnes, Richadson & Colburn (Donald J. Unger, Kazumune V. Kano, Carolyn D. Amadon and Shannon N. Rickard) for NTN Corporation, NTN Bearing Corporation of America, American NTN Bearing Manufacturing Corporation, NTN Driveshaft, Inc., NTN-Bower Corporation and NTN-BCA Corporation, plaintiffs.

     Peter D. Keisler, Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Claudia Burke); of counsel, David R. Mason and Arthur D. Sidney, Office of the Chief Counsel for Import Administration, United States Department of Commerce, for the United States, defendant.

     Stewart and Stewart (Terence P. Stewart, Geert De Prest and Lane S. Hurewitz) for The Timken U.S. Corporation, defendant-intervenor.

**OPINION**

**TSOUCALAS, Senior Judge:**   Plaintiffs, NTN Corporation, NTN Bearing Corporation of America, American NTN Bearing Manufacturing Corporation, NTN Driveshaft, Inc., NTN-Bower Corporation and NTN-BCA Corporation (collectively "NTN"), move pursuant to USCIT R. 56.2 for judgment upon the agency record challenging the United States Department of Commerce, International Trade Administration's ("Commerce") final determination entitled <u>Final Results of Antidumping Duty Administrative Reviews and Revocation of Orders in Part on Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Romania, Singapore, Sweden and the United Kingdom</u> ("<u>Final Results</u>"), 65 Fed. Reg. 49,219 (August 11, 2000).   The Torrington Company ("Timken"), as defendant-intervenor, supports Commerce's arguments that the <u>Final Results</u> are supported by substantial evidence and in accordance with law.[1]

Specifically, NTN contends that Commerce erred in: (1) restating NTN's home-market and United States inland freight expenses and unjustifiably applied facts available; (2) using adverse facts available margins for United States sales of NTN

---

[1]    This action was brought by The Torrington Company which was acquired by The Timken Company on February 18, 2003, and is known as Timken U.S. Corporation.   The Court refers to defendant-intervenor as Timken U.S. Corporation in the caption and as Timken throughout this opinion.

models compared to sales to home-market affiliates; (3) including export price ("EP") sales in its calculation of the constructed export price ("CEP") profit adjustment; (4) not calculating CEP profit on a level-of-trade ("LOT") basis; (5) recalculating NTN's home-market inventory carrying costs and refusing to adjust normal value ("NV) for all home-market commissions; (6) reallocating NTN's United States and home-market selling expenses without regard to LOT; (7) including NTN'S sample sales and sales with allegedly abnormally high profits in the calculation of NV and constructed value ("CV") profit; (8) making adjustments to NTN's cost of production ("COP") and CV; and, (9) failing to use CV after disregarding below-cost sales from the calculation of NV.

## BACKGROUND

The administrative determination at issue concerns the antidumping duty order on antifriction bearings (other than tapered roller bearings) and parts thereof from Japan for the period of review covering May 1, 1998, through April 30, 1999. See Final Results, 65 Fed. Reg. at 49,219. On April 6, 2000, Commerce published the preliminary results of the subject review. See Preliminary Results of Antidumping Duty Administrative Reviews, Partial Rescission of Administrative Reviews, and Notice of Intent to Revoke Orders in Part on Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany,

Italy, Japan, Romania, Sweden, Singapore and the United Kingdom, ("Preliminary Results") 65 Fed. Reg. 18,033.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 19 U.S.C. § 1516a(a) (2000) and 28 U.S.C. § 1581(c) (2000).

## STANDARD OF REVIEW

The Court will uphold Commerce's final determination in an antidumping administrative review unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ." 19 U.S.C. § 1516a(b)(1)(B)(i) (1994).

## I. Substantial Evidence Test

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Substantial evidence "is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620 (1966) (citations omitted). Moreover, "[t]he court may not

substitute its judgment for that of the [agency] when the choice is 'between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo.'" American Spring Wire Corp. v. United States, 8 CIT 20, 22, 590 F. Supp. 1273, 1276 (1984) (quoting Penntech Papers, Inc. v. NLRB, 706 F.2d 18, 22-23 (1st Cir. 1983) (quoting, in turn, Universal Camera, 340 U.S. at 488)).

## II.  Chevron Two-Step Analysis

To determine whether Commerce's interpretation and application of the antidumping statute is "in accordance with law," the Court must undertake the two-step analysis prescribed by Chevron U.S.A. Inc. v. National Resources Defense Council, 467 U.S. 837,(1984). Under the first step, the Court reviews Commerce's construction of a statutory provision to determine whether "Congress has directly spoken to the precise question at issue." Id. at 842. "To ascertain whether Congress had an intention on the precise question at issue, [the Court] employ[s] the 'traditional tools of statutory construction.'" Timex V.I., Inc. v. United States, 157 F.3d 879, 882 (Fed. Cir. 1998) (citing Chevron, 467 U.S. at 843 n.9). "The first and foremost 'tool' to be used is the statute's text, giving it its plain meaning. Because a statute's text is Congress's final expression of its intent, if the text answers the question, that is the end of the matter." Id. (citations omitted). Beyond the

statute's text, the tools of statutory construction "include the statute's structure, canons of statutory construction, and legislative history." Id. (citations omitted). But see Floral Trade Council v. United States, 23 CIT 20, 22 n.6, 41 F. Supp. 2d 319, 323 n.6 (1999) (noting that "[n]ot all rules of statutory construction rise to the level of a canon, however") (citation omitted).

If, after employing the first prong of Chevron, the Court determines that the statute is silent or ambiguous with respect to the specific issue, the question for the Court becomes whether Commerce's construction of the statute is permissible. See Chevron, 467 U.S. at 843. Essentially, this is an inquiry into the reasonableness of Commerce's interpretation. See Fujitsu Gen. Ltd. v. United States, 88 F.3d 1034, 1038 (Fed. Cir. 1996). Provided Commerce has acted rationally, the Court may not substitute its judgment for the agency's. See Koyo Seiko Co. v. United States, 36 F.3d 1565, 1570 (Fed. Cir. 1994) (holding that "a court must defer to an agency's reasonable interpretation of a statute even if the court might have preferred another"); see also IPSCO, Inc. v. United States, 965 F.2d 1056, 1061 (Fed. Cir. 1992). The "[C]ourt will sustain the determination if it is reasonable and supported by the record as a whole, including whatever fairly detracts from the substantiality of the evidence." Negev Phosphates, Ltd. v. United

States Dep't of Commerce, 12 CIT 1074, 1077, 699 F. Supp. 938, 942 (1988) (citations omitted). In determining whether Commerce's interpretation is reasonable, the Court considers the following non-exclusive list of factors: the express terms of the provisions at issue, the objectives of those provisions and the objectives of the antidumping scheme as a whole. See Mitsubishi Heavy Indus. v. Unites States, 22 CIT 541, 545, 15 F. Supp. 2d 807, 813 (1998).

## DISCUSSION

**I.** **Commerce Properly Restated NTN's Home-Market and United States Inland Freight Expenses and Justifiably Applied Facts Available**

**A.** **Statutory Background**

Under the antidumping duty statute, Commerce may determine that imported merchandise is sold in the United States "at less than its fair value," and that such practice causes material injury to a domestic industry. See 19 U.S.C. § 1673 (1994). Once such a determination is made, Commerce may levy an antidumping duty upon such merchandise. See id. The antidumping duty is "in an amount equal to the amount by which the normal value exceeds the export price . . . for the merchandise." Id.[2] Section 1677a(c) of Title

---

[2] Generally, normal value is the price at which the subject merchandise is first sold in the exporting country. See 19 U.S.C. § 1677b(a) (1994). Furthermore, "export price" is the price at which the subject merchandise is first sold by the producer or exporter outside the United States to an unaffiliated purchaser in

19 of the United States Code specifies increases and reductions to the price used to establish export price ("EP") and constructed export price ("CEP"). See 19 U.S.C. §1677a(c) (1994). Specifically, the statute states that the price used to establish EP and CEP is increased "when not included in such price, the cost of all containers and coverings and all other costs, charges, and expenses incident to placing the subject merchandise in condition packed ready for shipment to the United States." 19 U.S.C. § 1677a(c)(1). The EP and CEP is decreased by "the amount, if any, included in such price, attributable to any additional costs, charges, or expenses, and United States import duties, which are incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States." 19 U.S.C. § 1677a(c)(2).

In calculating normal value ("NV"), section 1677b(a)(6) (1994) of Title 19 of the United States Code specifies increases and decreases that are to be made to the price used for NV. The statute directs that the price be "increased by the costs of all containers and coverings and all other costs, charges, and expenses incident to placing the subject merchandise in condition packed

---

the United States for exportation to the United States. See 19 U.S.C. § 1677a(a) (1994). "Constructed export price" is the price at which the subject merchandise is first sold in the United States to a purchaser unaffiliated with the producer or exporter. See 19 U.S.C. § 1677a(b).

ready for shipment to the United States." 19 U.S.C. § 1677b(a)(6)(A). The price is to be decreased by, "when included in the price described in paragraph (1)(B), the cost of all containers and coverings and all other costs, charges, and expenses incident to placing the foreign like product in condition packed ready for shipment to the place of delivery to the purchaser." 19 U.S.C. § 1677b(a)(6)(B)(i). Additionally, the price is to be decreased by "the amount, if any, included in the price described in paragraph (1)(B), attributable to any additional costs, charges, and expenses incident to bringing the foreign like product from the original place of shipment to the place of delivery to the purchaser." 19 U.S.C. § 1677b(a)(6)(B)(ii).

Commerce's regulations state that "the interested party that is in possession of the relevant information has the burden of establishing to the satisfaction of [Commerce] the amount and nature of a particular adjustment." 19 C.F.R. § 351.401(b)(1) (1999). Commerce's regulations also address the allocation of expenses and price adjustments, stating that Commerce "may consider allocated expenses and price adjustments when transaction-specific reporting is not feasible, provided [Commerce] is satisfied that the allocation method used does not cause inaccuracies or distortions." 19 C.F.R. § 351.401(g)(1). In addition, the regulations state that "any party seeking to report an expense or

a price adjustment on an allocated basis must demonstrate to [Commerce's] satisfaction that the allocation is calculated on as specific a basis as is feasible, and must explain why the allocation methodology used does not cause inaccuracies or distortions."  19 C.F.R. § 351.401(g)(2).  Under the regulations, an allocation method is not to be rejected solely because it "includes expenses incurred, or price adjustments made, with respect to sales of merchandise that does not constitute subject merchandise or a foreign like product."  19 C.F.R. § 351.401(g)(4).

Under section 1677e(a)(2) of Title 19 of the United States Code, Commerce shall use "facts otherwise available" when "(1) necessary information is not available on the record, or (2) an interested party or any other person-- (A) withholds information that has been requested . . . or (D) provides such information but the information cannot be verified . . . in reaching the applicable determination under this subtitle."  19 U.S.C. § 1677e(a) (1994). Furthermore, if Commerce determines that "an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information . . . [then Commerce] may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available."  19 U.S.C. § 1677e(b).

### B.    Contentions of the Parties

#### 1.    NTN's Contentions

NTN contends that Commerce erred in: (a) rejecting NTN's allocation of home-market and United States inland freight expenses, and (b) using adverse facts available in calculating NTN's margin rate.  See Pl.'s Mot. and Mem. Supp. J. Agency R. ("NTN's Mem.") at 9.  NTN asserts that it adequately responded to Commerce's request for an allocation of both home-market and United States inland freight expenses.  See id. at 9-12.  NTN contends that it cannot use weight in its allocation of freight expenses because home-market and United States inland freight expenses are based on multiple factors and NTN, as it explained in its response to Commerce, does not keep records based on weight.  See id. at 10. Consequently, NTN allocated the freight expenses "based on value, logically choosing a factor which was common to all shipments." Id.

Furthermore, NTN elaborated that "freight in both [home-market and United States inland] is usually incurred based on factors that cannot be allocated, such as distance, bulk and mode of transportation . . . ." Id.  Commerce checked NTN's allocation of the home-market and United States inland freight expenses and examined NTN's contracts with freight companies.  In the Issues and

<u>Decision Memorandum</u>,[3] however, Commerce rejected NTN's allocation because "NTN did not explain why its allocation of freight expenses was not distortive."  NTN's Mem. at 11.

NTN argues that it fully and accurately responded to Commerce's inquiry about its allocation by "demonstrat[ing] how the expenses are actually incurred and [that Commerce] accepted NTN's methodology and resulting data at verification."  <u>Id.</u> at 11-12. NTN further asserts that Commerce, on prior occasions, accepted NTN's explanation and approved of NTN's methodology.  <u>See</u> <u>id.</u> at 12.  NTN contends that Commerce's application of facts available is unwarranted because Commerce verified NTN's methods and there is no evidence indicating that any distortion occurred as a result of NTN's allocation.  <u>See</u> <u>id.</u>

### 2.   **Commerce's Contentions**

Commerce responds that NTN did not adequately report home-market and United States inland freight expenses on the basis on

---

[3]    The full title of this document is <u>Issues and Decision Memorandum for the Administrative Reviews of Antifriction Bearings (other than tapered roller bearings) and parts thereof from France, Germany, Italy, Japan, Romania, Singapore, Sweden, and the United Kingdom - May 1, 1998, through April 30, 1999</u>, compiled as an appendix to the <u>Final Results</u>, 65 Fed. Reg. at 49,219 (generally accessible on the internet at http://ia.ita.doc.gov/frn/summary/ multiple/00-20441-1.txt.  The Court, in the interest of clarity, will refer to this document as <u>Issues & Decision Mem.</u> and match pagination to the printed documents provided by defendant.  <u>See</u> <u>e.g.</u>, Def.'s Mem. at App. 1, Ex. 1.

which NTN incurred them. See Def.'s Mem. Part. Opp'n NTN's Mot. J. Agency R. ("Def.'s Mem.") at 9-15. Rather, Commerce contends that NTN reported allocated expenses incurred on both in-scope and out-of-scope merchandise. See id. at 11. In a supplemental questionnaire dated October 21, 1999, Commerce asked NTN to revise its response, if necessary, "to reflect the basis on which the expenses are incurred or, if [] not possible, explain why such a recalculation is impossible and demonstrate that [NTN's] allocation methodology is not distortive." Id. at 12 (quoting from supplemental questionnaire). While NTN responded that it does not incur freight expenses on a single basis, thereby making it impossible to report freight expenses on the basis they were incurred, Commerce contends that NTN "did not demonstrate that its allocation methodology was not distortive. Rather, it merely stated that Commerce had accepted its methodology in prior reviews." Id.

Commerce asserts that it properly resorted to facts available because of NTN's failure to show that its allocation methodology was not distortive. See id. at 12-13. Commerce rejects NTN's argument that it had previously accepted NTN's allocation in prior reviews. See id. at 13. Rather, Commerce maintains that the acceptance of NTN's allocation in prior reviews "does not relieve [NTN] of the responsibility to demonstrate that its claimed

adjustment to normal value is not distortive." Def.'s Mem. at 13 (quoting Issues & Decision Mem. at 65-66). In the Issues & Decision Mem., Commerce determined that it "can not regard the reported expenses as a reliable or reasonable indicator of what those expenses would be had NTN Japan reported them on a transaction-specific basis." Issues & Decision Mem. at 65. Commerce reasoned that it was unable to determined that NTN acted to the best of its ability in selecting the allocation methodology it used. Id.

### 3. Timken's Contentions

Timken generally agrees with Commerce's decision to apply facts available for home-market and United States inland freight expenses incurred because NTN failed "to fully cooperate with Commerce's instructions . . . ." Resp. Timken, Def.-Intervenor, R. 56.2 Mot. NTN ("Timken's Resp.") at 15. Timken contends that "Commerce properly determined that NTN has the burden of proving entitlement to any favorable adjustment, and Commerce's supplemental question went to what NTN had to show." Id. Accordingly, Commerce appropriately required NTN to demonstrate non-distortion because NTN does not incur freight on the basis of sales value. See id. Timken argues that NTN "was evasive and offered no assurance to Commerce that the prior methodology would not result in distortions." Id. at 16.

Timken further contends that Commerce reasonably selected facts available for NTN's home-market freight expenses and did not deny the entire adjustment. See id. Rather, Commerce selected the lowest reported rates. See id. For NTN's United States inland freight expenses, Timken contends that denial of the adjustment would have benefitted NTN. See id. Consequently, "Commerce substituted an adverse rate based on reported NTN data." Id. Timken argues that Commerce's treatment of the allocations for home-market and United States inland freight expenses recognized the effects of denying the adjustment and provided an incentive for NTN to provide the requested data. See id.

### C. Analysis

#### 1. Commerce Properly Rejected NTN's Allocation

The relevant statute, directs Commerce to increase or reduce EP and CEP when certain criteria are met. See 19 U.S.C. § 1677a(c). Furthermore, under Commerce's regulations, the interested party has the burden of demonstrating to Commerce the amount and nature of a specific adjustment to be made to EP, CEP or NV. See 19 C.F.R. § 351.401(b)(1). The regulations allow Commerce to consider allocated expenses and adjustments when "transaction-specific reporting is not feasible." 19 C.F.R. § 351.401(g)(1). However, Commerce's acceptance of allocated expenses and adjustments is contingent. Before any allocations are accepted,

Commerce must first be "satisfied that the allocation method used does not cause inaccuracies or distortions." Id.  If Commerce is not satisfied, then it has the discretion to reject the allocations and adjustments sought by the interested party.  See id.

The Court rejects NTN's contention that Commerce erred in rejecting NTN's allocation of home-market and United States inland freight expenses.  NTN argues that Commerce changed its methodology by requesting NTN to demonstrate that its allocation was not distortive.[4]  Commerce, however, has the discretion to change its methodology, so long as its decision is reasonably supported by the record.

Agency statements provide guidance to regulated industries. "'An [agency] announcement stating a change in the method . . . is not a general statement of policy.'"  American Trucking Ass'ns, Inc. v. ICC, 659 F.2d 452, 464 n.49 (5th Cir. 1981) (quoting Brown Express, Inc. v. United States, 607 F.2d 695, 701 (5th Cir. 1979) (internal quotations omitted)).  While a policy denotes "the general principles by which a government is guided" by laws, BLACK'S LAW DICTIONARY 1178 (7th ed. 1999) (emphasis added), methodology refers only to the "mode of organizing, operating or performing

---

[4]     NTN argues that it fully and accurately responded to Commerce's inquiry about its allocation, and that Commerce had accepted NTN's explanation and approved of NTN's methodology in prior reviews.  See NTN's Mem. at 11-12.

something, especially to achieve [the goal of a statute]." <u>Id.</u> at 1005 (defining mode) (emphasis added). <u>Accord</u> <u>Avoyelles Sportsmen's League, Inc. v. Marsh</u>, 715 F.2d 897 (5th Cir. 1983); <u>Interstate Natural Gas Ass'n of Am. v. Federal Energy Regulatory Comm'n</u>, 716 F.2d 1 (D.C. Cir. 1983); <u>Hooker Chems. & Plastics Corp. v. Train</u>, 537 F.2d 620 (2d Cir. 1976). Consequently, the courts are even less in the position to question an agency action if the action at issue is a choice of methodology, rather than policy. <u>See, e.g.</u>, <u>Maier, P.E. v. United States Envtl. Prot. Agency</u>, 114 F.3d 1032, 1043 (10th Cir.) (citing <u>Professional Drivers Council v. Bureau of Motor Carrier Safety</u>, 706 F.2d 1216, 1221 (D.C. Cir. 1983)). Similarly, an agency decision to change its methodology, that is, to take an act of statutory implementation while pursuing the same policy, should be examined under the <u>Chevron</u> test and sustained if the new methodology is reasonable. <u>See, e.g.</u>, <u>Koyo Seiko Co. v. United States</u>, 24 CIT 364, 373-74, 110 F. Supp. 2d 934, 942 (2000) (stating that "'the use of different methods [of] calculati[on] . . . does not [mean there is a] conflict with the statute,'") (quoting <u>Torrington Co. v. United States</u>, 44 F.3d 1572, 1578 (Fed. Cir. 1995)).

The Court finds that, in the case at bar, Commerce's refusal to accept NTN's allocation was a justifiable change of methodology reasonably supported by the record. Accordingly, Commerce's

rejection of NTN's allocation of home-market and United States inland freight expenses is affirmed.

### 2.    Commerce Properly Applied Facts Available to NTN's Home-Market and United States Inland Freight Expenses

The Court finds NTN's argument that Commerce unjustifiably applied adverse facts available to NTN's home-market and United States inland freight expense allocation has no merit.    The antidumping duty statute mandates that Commerce use "facts otherwise available" (commonly referred to as "facts available") if "necessary information is not available on the record" of an antidumping proceeding.    See 19 U.S.C. § 1677e(a)(1) (1994). Commerce may apply facts available when it determines that an interested party withholds requested information or fails to cooperate with a request for information.    See 19 U.S.C. § 1677e(a) & (b).    The legislative goal behind Commerce's right to use facts available is to "induce respondents to provide Commerce with requested information in a timely, complete, and accurate manner . . . ."    National Steel Corp. v. United States, 18 CIT 1126, 1129, 870 F. Supp. 1130, 1134 (1994).    Consequently, Commerce enjoys broad, although not unlimited, discretion with regard to the propriety of its use of facts available.    See generally, Olympic Adhesives Inc. v. United States, 899 F.2d 1565 (Fed. Cir. 1990) (acknowledging Commerce's broad discretion to use facts available,

but pointing out that Commerce's resort to facts available is an abuse of discretion where the information Commerce requests does not and could not exist).

During the subject review, Commerce requested that NTN show that its allocation methodology was not distortive. See Issues & Decision Mem. at 65. NTN responded by stating that Commerce had previously found its methodology not to be distortive. See id. Commerce's acceptance of NTN's allocation methodology and finding the method to not be distortive in a previous review does not relieve NTN from showing non-distortion in the current review. See NTN Bearing Corp. of Am. v. United States ("NTN 2003"), 27 CIT ___, ___, 248 F. Supp. 2d 1256, 1268 (2003)(stating that "Commerce has the discretion to alter its policy, so long as Commerce presents a reasonable rationale for its departure from the previous practice").

Commerce requested NTN demonstrate that its allocation methodology was not distortive in order "to alleviate [Commerce's] concern that NTN Japan's allocation methodology might shift expenses incurred on non-subject merchandise to sales of subject merchandise." Def.'s Mem. at 12 (quoting Issues & Decision Mem. at 65). The Court finds Commerce's rationale for reconsidering its past position convincing and reasonable. Commerce properly determined that NTN had not cooperated with its request to provide

information regarding the allocation method used by NTN. Moreover, Commerce justifiably applied facts available to state NTN's home-market and United States inland freight expenses.

## II. Commerce Properly Used Adverse Facts Available Margins for United States Sales of NTN Models Compared to Sales to Home-Market Affiliates

### A. Statutory Background

Section 1677b(a)(5) (1994) of Title 19 of the United States Code provides that for determining NV, "if the foreign like product is sold or . . . offered for sale through an affiliated party, the prices at which the foreign like product is sold (or offered for sale) by such affiliated party may be used . . . ." The statute, however, does not provide Commerce with guidance as to when the prices at which the foreign like product sold by an affiliated party should be used. Rather, Commerce's regulations address when sales and offers for sales to an affiliated party and through an affiliated party may be used. See 19 C.F.R. § 351.403 (1999).

For sales to an affiliated party by an exporter or producer, the regulations state that Commerce "may calculate normal value based on that sale only if satisfied that the price is comparable to the price at which the exporter or producer sold the foreign like product to a person who is not affiliated with the seller." 19 C.F.R. § 351.403(c). For sales by an exporter or producer

through an affiliated party (<u>i.e.</u>, downstream sales), Commerce "may calculate normal value based on the sale by such affiliated party." 19 C.F.R. § 351.403(d). Commerce, however, will normally not calculate NV using such prices, if the sales by an exporter or producer to affiliated parties "account for less than five percent of the total value (or quantity) of the exporter's or producer's sales of the foreign like product in the market in question or if sales to the affiliated party are comparable . . . ." <u>Id.</u>

Section 1677e(b) of Title 19 of the United States Code, provides that if Commerce determines that "an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information . . . [then Commerce] may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available."

### B.    Contentions of the Parties

#### 1.    NTN's Contentions

NTN complains that Commerce erred in applying adverse facts available to determine the margin for United States sales of NTN models compared to sales to home-market affiliates. <u>See</u> NTN's Mem. at 14-18. NTN argues that its response to Commerce's request for total value of sales by home-market affiliates was adequate for the calculation of NTN's margin. <u>See</u> <u>id.</u> Moreover, NTN asserts that

"there is no evidence whatsoever that NTN's actions meet any of the statutory minimums which would warrant adverse 'facts available.'" Id. at 15-16. NTN states that for Commerce to apply an adverse inference to facts available "an interested party must have failed to cooperate by not acting to the best of its ability to comply with a request for information." Id. at 15. The statutory provisions, according to NTN, are intended to prevent the use of adverse facts available when a party makes its best effort to cooperate with Commerce. See id.

NTN states that it responded to Commerce's questions regarding downstream sales to affiliated parties as it had in previous reviews: "this data could not be provided because NTN was unable to obtain this information from its affiliated resellers." Id. at 16. NTN submitted to Commerce letters from affiliated resellers that explained why they could not provide NTN with certain information. See id. In addition, NTN explained at verification that the resellers do not have access to NTN's computer program and database that allows NTN to respond to Commerce's questions. See id. NTN maintains that its computer program was created to allow NTN to categorize data in ways that allow it to respond to Commerce. The program is proprietary in nature, and NTN contends that it should not be required to share the program with affiliated or unaffiliated companies. See id. NTN further asserts that it

provided Commerce with documentation from each reseller from whom it could not obtain resale information explaining why such information was unobtainable. See id. at 18.

### 2.    Commerce's Contentions

Commerce responds that its determination to apply adverse facts available was supported by substantial record evidence and in accordance with law. Def.'s Mem. at 15-23. Specifically, Commerce contends that its regulations prevent the use of "home-market affiliated party sale[s] unless the exporter or producer or reseller demonstrates that the transaction was made at arm's length." Id. at 17. Accordingly, Commerce maintains that "the respondent has to present evidence establishing to Commerce's satisfaction that the related party prices were comparable to unrelated party prices." Id. To determine price comparability, Commerce states that its established practice is to examine whether related party prices are equal to or greater than unrelated party prices. See id. Furthermore, Commerce argues that "when a respondent fails to submit pertinent information, Commerce is authorized to resort to facts available." Id. (citing 19 U.S.C. § 1677e(a)).

Here, Commerce contends that NTN failed to report resale information by its home-market affiliates. In its supplemental questionnaire, Commerce requested that NTN document the steps taken

to obtain downstream sales data for each affiliate from which NTN could not obtain such information. See id. at 19. NTN's response was that it requested, but was unable to obtain, the information for the same reasons it provided in past reviews. See id. Commerce requested that NTN provide the total downstream value of sales by affiliates in which NTN owns a majority interest. See id. at 20 (citing Issues & Decision Mem. at 7). While NTN provided information for three such affiliate resellers, it was unable to provide such information for two other affiliated resellers. See id. Thus, Commerce "resorted to adverse facts available for those [United States] sales of bearing models which were sold to those affiliates in which NTN Japan holds a majority interest . . . ." Id.

Commerce concedes that it did not apply its arm's length test, pursuant to 19 C.F.R. § 351.403(c), to the sales price of two of NTN's affiliated resellers prior to seeking downstream sales information. See id. at 23. Consequently, Commerce requests that the issue be remanded for Commerce to conduct the test and, if necessary, to open the record for additional information. See id.

### 3.    Timken's Contentions

Timken generally agrees with Commerce that NTN failed to provide Commerce with the requested information. Timken's Resp. at 18-24. Timken maintains that NTN "failed to either: (a) report

downstream sales by these affiliates as instructed by the initial questionnaire, or (b) revise its data to at least provide <u>the total downstream value of the sales by each affiliate</u> as instructed by the supplemental questionnaire." <u>Id.</u> at 22 (emphasis in original). Timken states that "Commerce's rules on affiliated companies <u>assume</u> that companies 'control' their affiliates sufficiently to guarantee cooperation in answering questionnaires." <u>Id.</u> (emphasis in original). Since NTN did not provide the requested information, Timken maintains that Commerce properly applied adverse facts available. <u>See</u> <u>id.</u> at 23.

Timken disagrees with Commerce that the issue should be remanded. <u>See</u> <u>id.</u> at 23-24. Rather, Timken argues that the record evidence supports Commerce's determination that the arm's length test could not be reliably applied because NTN did not act to the best of its ability in reporting sales by home-market affiliates. <u>See</u> <u>id.</u>

### C.   Analysis

The Court finds that Commerce properly applied adverse facts available to sales by resellers in which NTN owns a majority interest. Under section 1677e(b) of Title 19 of the United States Code, if Commerce determines that a party has not acted to the best of its ability to provide requested information, then Commerce may use adverse facts available. <u>See</u>  19 U.S.C. § 1677e(b).  Here,

Commerce reasonably determined that NTN had not acted to the best of its ability in responding to its requests for information on sales by affiliated resellers. The Court is not convinced that NTN fully complied with Commerce's requests for information regarding downstream sales. While NTN did not obtain the requested information from its affiliated resellers for the same reasons NTN gave Commerce in previous reviews, NTN failed to document the steps it took to obtain the downstream sales data, as Commerce requested. See Issues & Decision Mem. at 7. Furthermore, for Commerce to use the sale price to an affiliated party, NTN must present evidence that "the price is comparable to the price at which the exporter or producer sold the foreign like product to a person who is not affiliated with the seller." 19 C.F.R. § 351.403(c). NTN failed to demonstrate that the sales to and through NTN's affiliates were made at arm's length. See NTN Bearing Corp. of Am. v. United States ("NTN 1999"), 23 CIT 486, 498, 83 F. Supp. 2d 1281, 1292 (1999) (stating that "there is a strong presumption that Commerce will not use a related-party price in the calculation of [fair market value] 'unless the manufacturer demonstrates to Commerce's satisfaction that the prices are at arm's length'" (quoting SSAB Svenskt Stal AB v. United States, 21 CIT 1007, 1009, 976 F. Supp. 1027, 1030 (1997)). Based on NTN's inadequate responses, the Court finds that Commerce justifiably applied adverse facts available and was in accordance with law.

In <u>NTN Bearing Corp. of Am. v. United States</u> ("<u>NTN 2002</u>"), 26 CIT \_\_\_, \_\_\_, 186 F. Supp. 2d 1257, 1287-88 (2002), this Court upheld Commerce's application of the arm's length test to exclude certain home-market sales to affiliated parties from the NV calculation.  The Court noted that, under 19 U.S.C. § 1677b(a)(5), Commerce is allowed considerable discretion in deciding whether to include affiliated party sales when calculating NV.  <u>See</u> <u>NTN 2002</u>, 26 CIT at \_\_\_, 186 F. Supp. 2d at 1287 (citing <u>Usinor Sacilor v. United States</u>, 18 CIT 1155, 1158, 872 F. Supp. 1000, 1004 (1994)). The Court further noted that it has repeatedly upheld Commerce's arm's length test on the basis that respondents have failed to present "'record evidence tending to show that . . . Commerce's test was unreasonable.'" <u>NTN 2002</u>, 26 CIT at \_\_\_, 186 F. Supp. 2d at 1287 (quoting <u>NTN Bearing Corp. of Am. v. United States</u> ("<u>NTN 1995</u>"), 19 CIT 1221, 1241, 905 F. Supp. 1083, 1100 (1995), and citing <u>Torrington Co. v. United States</u>, 21 CIT 251, 261, 960 F. Supp. 339, 348 (1997), <u>NSK Ltd. v. Koyo Seiko Co.</u>, 190 F.3d 1321, 1328 (Fed. Cir. 1999)).

Here, NTN has failed to provide evidence that Commerce's application of the arm's length test was unreasonable.  However, in light of Commerce's failure to apply the arm's length test to the sales prices of the two affiliated resellers, the Court remands this issue to Commerce to conduct the arm's length test, in

accordance with 19 C.F.R. § 351.403(c), to determine whether the sales prices were comparable to the price at which NTN sold the subject merchandise to unaffiliated parties.

### III. Commerce Properly Included EP Sales in its Calculation of CEP Profit

#### A. Statutory Background

In calculating CEP, Commerce is required to deduct "the profit allocated to the expenses described in [19 U.S.C. § 1677a(d)(1) and (2)]," from the price charged to the first unaffiliated purchaser in the United States. U.S.C. § 1677a(d)(3). "Profit" is defined as "an amount determined by multiplying the total actual profit by the applicable percentage." 19 U.S.C. § 1677a(f)(1). Under 19 U.S.C. § 1677a(f)(2)(D), "actual profit" is defined as the "total profit earned . . . with respect to the sale of the same merchandise for which total expenses are determined . . . ." The term "total expenses" means "all expenses in the first of [three] categories which applies and which are incurred by or on behalf of the foreign producer and foreign exporter of the subject merchandise and by or on behalf of the United States seller affiliated with the producer or exporter with respect to the production and sale of such merchandise . . . ." 19 U.S.C. § 1677a(f)(2)(C). The first category covers "expenses incurred with respect to the subject merchandise sold in the United States and

the foreign like product sold in the exporting country . . . ." 19 U.S.C. § 1677a(f)(2)(C)(i). "Subject merchandise," in turn, is defined as "the class or kind of merchandise that is within the scope of . . . a review . . . ." 19 U.S.C. § 1677(25) (1994).

### B. Contentions of the Parties

#### 1. NTN's Contentions

NTN contends that Commerce erred by including EP sales in the calculation of CEP profit. See NTN's Mem. at 18. Specifically, NTN argues that there is no provision in the statute for the inclusion of EP expenses or profit in this calculation. See id. at 18-22. NTN asserts that the statute clearly states that the adjustment of profit to the CEP is to be based on expenses incurred in the United States as a percentage of total expenses. See id. NTN argues that under the canon of statutory construction of expressio unius est exclusio the specific reference to CEP in the definition of "total expenses" precludes Commerce from including EP expenses in the calculation of CEP profit. See id. at 19. NTN asserts that "just as EP expenses cannot be considered for the CEP profit adjustment, it follows logically that sales revenue for EP sales also cannot be included [in the calculation of CEP profit.]" Id. at 20 (emphasis in original). NTN points out that the statutory definition of "total actual expenses" directly makes reference to the definition of total expenses. See id. NTN

consequently deduces that Commerce must calculate total profit using the same transactions to calculate CEP total expenses. See id.

## 2. Commerce's Contentions

Commerce contends that the inclusion of revenues and expenses resulting from NTN's EP sales in the calculation of CEP profit was a reasonable interpretation of the statutory scheme. See Def.'s Mem. at 23-28. Commerce points out that the term "subject merchandise" is defined as "'the class or kind of merchandise that is within the scope of . . . a review. . . .'" See id. at 24 (quoting 19 U.S.C. § 1677(25)). Commerce notes that the term "subject merchandise" is referred to in the statute that defines "total expenses," see 19 U.S.C. § 1677a(f)(2)(C)(i), and therefore "total expenses" includes NTN's EP and CEP sales. See Def.'s Mem. at 24-27. Commerce further asserts that its September 4, 1997, Policy Bulletin states:

> The calculation of total actual profit under section [1677a(f)(2)(D)] includes all revenues and expenses resulting from the respondent's [EP] sales as well as from its [CEP] and home market sales . . . The basis for total actual profit is the same as the basis for total expenses under [19 U.S.C. § 1677a(f)(2)(C)]. The first alternative under [19 U.S.C. § 1677a(f)(2)(C)] states that, for purposes of determining profit, the term "total expenses" refers to all expenses incurred with respect to the subject merchandise sold in the United States (as well as in the home market). Thus, where the respondent makes both EP and CEP, sales of the subject merchandise would necessarily encompass all such transactions.

See id. at 24-25 (citing Def.'s Mem. at Ex. 3).

Commerce also asserts that the Statement of Administrative Action ("SAA")[5] clarifies the point by explaining that the total expenses are all expenses incurred by or on behalf of the foreign producer and exporter and the affiliated seller in the United States with respect to the production and sale of three alternatives. See id. at 26. The first category referred to in the SAA is "the subject merchandise sold in the United States." Id. Commerce contends that this "by definition, means the class or kind of merchandise which is within the scope of a review and, in this review, includes both CEP and EP sales." Id. Consequently, Commerce maintains that it properly included these sales when it calculated CEP profit. See id. at 28.

---

[5]    The SAA represents "an authoritative expression by the Administration concerning its views regarding the interpretation and application of the Uruguay Round agreements." H.R. Doc. No. 103-316, at 656 (1994), reprinted in 1994 U.S.C.C.A.N. 4040. "It is the expectation of the Congress that future Administrations will observe and apply the interpretations and commitments set out in this Statement." Id.; see also 19 U.S.C. § 3512(d) (1994) ("The statement of administrative action approved by the Congress . . . shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application.")

### 3.    Timken's Contentions

Timken agrees with Commerce that it is a reasonable interpretation of the statute and consistent with agency practice to calculate CEP profit on the basis of all United States sales. See Timken's Resp. at 26-28.

### C.  Analysis

Based upon its interpretation of the statutory language and upon the SAA's reference to CEP, NTN claims that there are only two categories of expenses that Commerce could use in calculating CEP profit: those used to calculate NV and those used to calculate CEP. See NTN's Mem. at 18-21. Additionally, NTN states that just as EP expenses cannot be used in calculating CEP profit, neither can sales revenue be used for EP sales. See id. at 20. NTN, however, ignores two issues. To start, the first category of total expenses under 19 U.S.C. § 1677a(f)(2)(C) is not limited to expenses incurred with respect to CEP sales made in the United States and the foreign like product sold in the exporting country. It also covers expenses incurred with respect to EP sales because the statute refers to "expenses incurred with respect to the subject merchandise sold in the United States." 19 U.S.C. § 1677a(f)(2)(C). The term "subject merchandise" is defined in 19 U.S.C. § 1677(25) as the class or kind of merchandise that is within the scope of a review. The class or kind of merchandise in

this review includes both CEP and EP sales.  Second, as the SAA
explains, the total expenses are all expenses incurred with respect
to the production and sale of the first of the three alternatives.
See H.R. Doc. No. 103-465, at 824, reprinted in 1994 U.S.C.C.A.N.
at 4164.

The Court agrees that the SAA's reference to "the subject
merchandise sold in the United States," means the class or kind of
merchandise which is within the scope of a review.  See id.
Accordingly, the Court is not convinced that Commerce's
interpretation of the statutory scheme is unreasonable and sustains
Commerce's inclusion of EP sales in the calculation of CEP profit.

## IV.  Commerce Properly Calculated CEP Without Regard to LOT

### A.    Statutory Background

In calculating CEP, Commerce must deduct "the profit allocated
to the expenses described" in pertinent subparts of 19 U.S.C. §
1677a(d) from the price at which the merchandise is sold to the
first unaffiliated purchaser in the United States.  See 19 U.S.C.
§ 1677a(d)(3).  The term "profit" is defined as "an amount
determined by multiplying the total actual profit by the applicable
percentage."  19 U.S.C. § 1677a(f)(1).  The term "actual profit"
is, in turn, defined as the "total profit earned . . . with respect
to the sale of the same merchandise for which total expenses are

determined under such subparagraph." 19 U.S.C. § 1677a(f)(2)(D).

The term "total expenses" is defined as:

> all expenses in the first of the following categories
> which applies and which are incurred by or on behalf of
> the foreign producer and foreign exporter of the subject
> merchandise and by or on behalf of the United States
> seller affiliated with the producer or exporter with
> respect to the production and sale of such merchandise:
>
> (i) The expenses incurred with respect to the
> subject merchandise sold in the United States and the
> foreign[-]like product sold in the exporting country if
> such expenses were requested by the administering
> authority for the purpose of establishing normal value
> and constructed export price.
>
> (ii) The expenses incurred with respect to the
> narrowest category of merchandise sold in the United
> States and the exporting country which includes the
> subject merchandise.
>
> (iii) The expenses incurred with respect to the
> narrowest category of merchandise sold in all countries
> which includes the subject merchandise.

19 U.S.C. § 1677a(f)(2)(C).


### B.   Contentions of the Parties

NTN complains that Commerce should calculate CEP profit on an

LOT basis. See NTN's Mem. at 21-22. NTN concedes that the Court

has agreed with Commerce's methodology in NTN 2000, 24 CIT at 411-

14, 104 F. Supp. 2d at 133-35, but maintains that under the

preference expressed by the language of 19 U.S.C. § 1677a(f), NTN's

profit should have been calculated on the narrowest possible basis.

See NTN's Mem. at 21-22. Consequently, NTN asserts that "since

[CV] profit [is] calculated by level of trade, CEP profit should be

calculated to account for level of trade differences." Id. at 22.

Commerce maintains that its calculation of NTN's CEP profit is proper because the statute does not expressly refer to LOT. See Def.'s Mem. at 28-31. Commerce asserts that neither the statute nor the SAA require the calculation of CEP profit to be based upon a more specific category than the class or kind of merchandise. See id. at 30 (citing Issues & Decision Mem. at 18). Furthermore, Commerce argues that NTN's interpretation of the statute is "misplaced." See id. The statute refers to "narrowest category" in its description of the second and third alternative methods, which are based upon financial reports and not the first alternative. See id. Commerce maintains that it applied the first alternative because NTN provided the necessary data. See id. Finally, Commerce asserts that in NTN 2000, 24 CIT at 411-14, 104 F. Supp. 2d at 133-35, the Court found Commerce's calculation of CEP without regard to LOT to be a reasonable interpretation of 19 U.S.C. § 1677a(f). See Def.'s Mem. at 30.

Timken supports Commerce's position and asserts that the Court has affirmed Commerce's calculation of CEP without regard to LOT for previous reviews. See Timken's Resp. at 28-29.

**C. Analysis**

Section 1677a(f) of Title 19 of the United States Code does not reference LOT. Accordingly, the Court's duty under <u>Chevron</u> is to review the reasonableness of Commerce's statutory interpretation. <u>See</u> <u>IPSCO,</u> 965 F.2d at 1061 (quoting <u>Chevron</u>, 467 U.S. at 844). This Court upheld Commerce's refusal to calculate CEP on an LOT-specific basis in <u>NTN 2000</u>, 24 CIT at 411-14, 104 F. Supp. 2d at 133-35, finding it to be reasonable and in accordance with law. The Court examined the language of the statute and concluded that the statute clearly contemplates that, in general, the "narrowest category" will include the class or kind of merchandise that is within the scope of an investigation or review. <u>See</u> <u>id.</u> The Court based its conclusion on its examination of the definition of "total expenses" contained in subsections (ii) and (iii) of 19 U.S.C. § 1677a(f)(2)(C). <u>See</u> <u>id.</u> Both subsections refer to "expenses incurred with respect to the narrowest category of merchandise . . . which includes the subject merchandise." 19 U.S.C. § 1677a(f)(2)(C). The term "subject merchandise" is defined as "the class or kind of merchandise that is within the scope of an investigation . . . ." 19 U.S.C. § 1677(25).

The statute envisions that the "narrowest category" will be the class or kind of merchandise that is within the scope of a particular review at issue. Commerce did not read the statutory

scheme as contemplating that it would have to consider a much narrower subcategory of merchandise, such as one based upon an LOT. See Issues & Decision Mem. at 18 (relying on H.R. Doc. 103-316 at 824-25, reprinted in 1994 U.S.C.C.A.N. at 4164, and 19 U.S.C. § 1677a(f)(2)(C)(i)).

While NTN contends that Commerce should calculate CEP profit to account for differences because "[t]here is no reason [for Commerce] to use a less specific, less accurate mode of calculation," NTN's Mem. at 22, a CEP profit calculation based upon a broader profit line than the subject merchandise will not necessarily produce a distorted result.

> No distortion in the profit allocable to [United States] sales is created if total profit is determined on the basis of a broader product-line than the subject merchandise, because the total expenses are also determined on the basis of the same expanded product line. Thus, the larger profit pool is multiplied by a commensurately smaller percentage.

H.R. Doc. No. 103-465, at 825, reprinted in 1994 U.S.C.C.A.N. at 4164-65. Accordingly, as in NTN 2000, 24 CIT at 411-14, 104 F. Supp. 2d at 133-35, the Court finds that Commerce reasonably interpreted 19 U.S.C. § 1677a(f) in refusing to apply a narrower subcategory of merchandise such as one based on LOT. Based on the foregoing, the Court upholds Commerce's refusal to calculate CEP profit for NTN on an LOT basis.

**V.    Commerce Properly Recalculated NTN's Home-Market Inventory Carrying Costs and Refused to Adjust NV for all Home-Market Commissions**

   **A.    Statutory Background**

Section 1677b(a)(6) of Title 19 of the Unites States Code directs Commerce to increase or decrease the price used for NV "by the amount of any difference (or lack thereof) between the [EP] or [CEP] and the price described in paragraph (1)(B) . . . that is established to the satisfaction of [Commerce] to be wholly or partly due to . . . other differences in the circumstances of sale." 19 U.S.C. 1677b(a)(6)(C) (1994). Furthermore, Commerce's regulations provide guidance for the calculation of NV and the making of adjustments "to account for certain differences in the circumstances of sales in the United States and foreign markets." 19 C.F.R. § 351.410(a). The regulations state that "with the exception of the allowance described in paragraph (e) of this section . . . [Commerce] will make circumstances of sale adjustments under [19 U.S.C. 1677b(a)(6)(C)(iii)] only for direct selling expenses and assumed expenses." 19 C.F.R. § 351.410(b). "Direct selling expenses" is defined as expenses "such as, commissions, credit expenses, guarantees, and warranties, that result from, and bear a direct relationship to, the particular sale in question." 19 C.F.R. § 351.410(c). "Assumed expenses" is defined as the selling expenses "assumed by the seller on behalf of

the buyer." 19 C.F.R. § 351.410(d).

Pursuant to Commerce's regulations, in making adjustments to NV, CV, or CEP, "the interested party that is in possession of the relevant information has the burden of establishing to the satisfaction of [Commerce] the amount and nature of a particular adjustment . . . ." 19 C.F.R. § 351.401(b)(1) (1999).

### B. Commerce's Recalculation of NTN's Home-Market Inventory Carrying Costs

#### 1. Contentions of the Parties

NTN contends that Commerce erred in recalculating NTN's home-market inventory carrying costs. See NTN's Mem. at 22-23. Specifically, NTN argues that, at verification, Commerce "reviewed and accepted both NTN's beginning and ending inventory values, the cost of goods sold, and the short term borrowing rate." Id. at 23. NTN states that Commerce has created a facts available situation even though there is adequate verified data on the record. See id. NTN additionally asserts that Commerce accepted NTN's methodology in the previous reviews, "and has not presented any reasons for a change in its methodology in the ninth and tenth review." Id.

Commerce responds that it has been granted discretion to devise its own methodology to calculate credit expenses because the statute does not specify any method that Commerce should use. See

Def.'s Mem. at 32. Commerce points out that it has been its practice "to impute [United States] and home-market inventory carrying costs for the period of time that the merchandise remains in inventory." Id. at 32-33. Here, Commerce determined that NTN's calculation of inventory carrying costs did not reflect costs accurately because it did not account for the time the subject merchandise remained in inventory. See Def.'s Mem. at 33 (citing Issues & Decision Mem. at 30-31). Commerce, therefore, recalculated the inventory carrying costs using its own standard formula. See Issues & Decision Mem. at 31. Commerce finally argues that the verification of NTN's inventory carrying costs does not mean that Commerce accepted NTN's methodology for calculating the expense. See id. Rather, Commerce asserts that it simply verified the expense reported and not the actual method used to calculate the expense. See id.

Timken agrees with Commerce that it was proper to recalculate NTN's inventory carrying costs because NTN's methodology was not consistent with Commerce's methodology. Timken's Resp. at 31-32.

### 2. Analysis

The Court agrees with Commerce that 19 U.S.C. § 1677b(a)(6) does not specify a method that Commerce should use in calculating credit expenses. See 19 U.S.C. § 1677b(a)(6). Consequently, Commerce has discretion to create its own reasonable method to

calculate credit expenses.[6]  NTN argues that Commerce accepted NTN's methodology for calculating the inventory carrying costs at verification and therefore should have accepted NTN's methodology for the Final Results.  See NTN's Mem. at 22-23.  The Court finds this argument unpersuasive.  Commerce is directed under the antidumping duty statute to determine the antidumping duty "as accurately as possible."  See Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1191 (Fed. Cir. 1990).  Accordingly, Commerce may reasonably determine that the method used to report an expense may prevent it from fulfilling a statutory duty.[7]

Furthermore, NTN argues that Commerce changed its methodology by refusing to accept NTN's calculation methodology for the current review although Commerce had accepted it in previous reviews.  See NTN's Mem. at 23.  This Court has repeatedly found, however, that Commerce may change its methodology as long as such change is reasonable.  See NTN 2003, 27 CIT ___, ___, 248 F. Supp. 2d at 1267-69; Peer Bearing Co. v. United States, 25 CIT ___, ___, 182 F.

---

[6]    The Court has approved of Commerce's practice of imputing United States and home-market inventory carrying costs for the period of time that the subject merchandise remains in inventory. See Timken Co. v. United States, 18 CIT 619, 625-26, 858 F. Supp. 206, 212-13 (1994).

[7]    The Court agrees with Commerce that its verification of an expense does not mean that Commerce accepted the method used by NTN to report the expense.  Commerce may reject a respondent's calculation methodology in its final results even though it has verified the expense reported for the preliminary results.

Supp. 2d 1285, 1300-01 (2001); Timken Co. v. United States, 25 CIT
___, ___, 166 F. Supp. 2d 608, 620-21 (2001).  In the case at bar,
Commerce reasonably rejected NTN's calculation methodology because
Commerce determined that NTN's calculation failed to account for
the number of inventory days and, therefore, did not reflect the
costs accurately.  Accordingly, the Court sustains Commerce's
recalculation of NTN's home-market inventory carrying costs.

## C. Commerce Improperly Refused to Adjust NV for all Home-Market Commissions

### 1. Contentions of the Parties

NTN complains that Commerce's methodology for determining the
arm's length nature of commissions paid is unreasonable.  See NTN's
Mem. at 24-26.  Specifically, NTN contends that Commerce's
methodology is flawed because it does not account for actual
services rendered in exchange for commissions.  See id. at 24.  NTN
asserts that it negotiates its commission rates individually with
each selling agent, each of which "deals with a myriad of different
product mixes and customers, making their jobs more or less
intensive depending upon the totality of the circumstances."  Id.
at 25.  During the review at issue, NTN responded to Commerce's
supplemental questionnaire regarding the activities of each
commissionaire, and provided detailed contractual information
regarding volume of sales and transactions.  See id.

NTN contends that it provided Commerce with all the information needed to adjust NV for all home-market commissions but that Commerce "reduce[d] its analysis to a bare comparison of average rates and nominal selling functions [which] ignores commercial reality." Id. at 26. Consequently, NTN complains that Commerce "should not have adjusted the normal value for commission rates if their percentage for unaffiliated parties [is] less than the percentage for affiliated parties." Id. Rather, NTN argues that Commerce should have determined that the home-market commission rates were made at arm's length and treated the rates as a direct expense in determining the NV calculation. See id.

Commerce responds that it acted properly in not adjusting NV for all home-market commissions paid to commissionaires affiliated with NTN. See Def.'s Mem. at 34-39. Commerce asserts that it followed its standard practice-- comparing the commissions paid to affiliated selling agents with those paid to unaffiliated selling agents-- to determine whether to make an adjustment to NV based upon the commissions paid. See id. at 36. If Commerce determines that the commissions were not at arm's length, then it disregards the commissions and treats them as intra-company transfers. See id. Based on information submitted by NTN and the application of its arm's length test, Commerce "determined that commissions paid by NTN to certain affiliates were not at arm's length because the

affiliates were paid a higher commission rate than unaffiliated agents for performing the same or similar functions." Id. at 37.

Commerce asserts that "in order to make a determination that the commissions the respondent paid were at arm's length . . . some kind of comparison of the rates paid to affiliates to the rates paid to unaffiliated commissionaires" must be completed or conducted. See Issues & Decision Mem. at 34. Commerce contends that NTN did not provide suggestions or data that it could use to refine its analysis. See id. Citing 19 C.F.R. § 351.401(b), Commerce maintains that NTN has the burden to prove that the commissions paid were at arm's length and that NTN failed to meet this burden. See Def.'s Mem. at 36. Accordingly, Commerce asserts that it properly did not adjust NV for all home-market commissions paid to affiliated commissionaires. See id.

Timken agrees with Commerce that it was appropriate not to adjust NV for all home-market commissions. See Timken's Resp. at 32-36. Furthermore, Timken points out that the statute does not prescribe a specific test for Commerce to use to determine whether the commission rates are at arm's length. See id. at 34. Consequently, Timken asserts that "this matter is committed to agency discretion, and the Court reviews Commerce's methodology in accordance with the Chevron standard." Id. Timken argues that the Court in Torrington Co. v. United States, 25 CIT ___, ___, 146 F.

Supp. 2d 845 (2001), rejected similar arguments made by NTN and that the same reasoning and conclusions apply in the case at bar. See Timken's Resp. at 35.  Timken also contends that "it is reasonable [for Commerce] to presume that commissions paid to affiliate[s] which are higher than those paid to unaffiliated parties are not at arm's length."  Id. at 36.

### 2.    Analysis

"Commerce is given considerable deference in its decision to grant a circumstances-of-sale adjustment." Outokumpu Copper Rolled Products AB v. United States, 18 CIT 204, 211, 850 F. Supp. 16, 22 (1994) (citing Smith-Corona Group, Consumer Products Div., SCM Corp. v. United States, 713 F.2d 1568, 1575 (Fed. Cir. 1983), cert. denied, 465 U.S. 1022 (1984)).  "As long as Commerce's 'decision is reasonable, then Commerce has acted within its authority even if another alternative is more reasonable.'" Id. (quoting Koyo Seiko Co. v. United States, 16 CIT 366, 372, 796 F. Supp. 517, 523 (1992), rev'd and remanded on other grounds, 36 F.3d 1565 (Fed. Cir. 1994)).  The SAA additionally clarifies that "[C]ommerce's . . . practice with respect to this adjustment [is] to remain unchanged."  H.R. Doc. No. 103-465, at 828, reprinted in 1994 U.S.C.C.A.N. at 4167.

Under 19 C.F.R. § 351.410(b), Commerce makes the "circumstances of sale" adjustments pursuant to 19 U.S.C. §

1677b(a)(6)(C)(iii) only for direct selling expenses and assumed expenses. Direct selling expenses include commissions "that result from, and bear a direct relationship to, the particular sale in question." 19 C.F.R. § 351.410(c). Pursuant to its practice, Commerce has denied adjustments for commissions where it was not provided with sufficient evidence that commissions paid to affiliated commissionaires were made at arm's length. See, e.g., Final Results of Antidumping Duty Administrative Review of Industrial Phosphoric Acid From Belgium, 64 Fed. Reg. 49,771, 49,772 (Sept. 14, 1999); Final Results of Antidumping Duty Administrative Reviews on Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Singapore, and the United Kingdom, 62 Fed. Reg. 2081, 2098-99 (Jan. 15, 1997); Final Results of Antidumping Duty Administrative Reviews and Revocation in Part of an Antidumping Finding on Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From Japan and Tapered Roller Bearings, Four Inches or Less in Outside Diameter, and Components Thereof, From Japan, 61 Fed. Reg. 57,629, 57,638 (Nov. 7, 1996). In this case, Commerce followed the same practice.[8] See Issues & Decision Mem. at 34-35.

---

[8] NTN states that "there are many important factors besides 'function' and rate, which determine the commission paid to each commissionaire." NTN's Mem. at 24. Certain agents, for example, may provide services for a large number of customers and large volume transactions, while others may only handle smaller volume transactions for a limited number of customers. See NTN's Mem. at

Under the relevant regulations, NTN has "the burden of establishing to the satisfaction of [Commerce] the amount and nature of a particular adjustment . . . ." 19 C.F.R. § 351.401(b)(1). NTN failed to point out specific evidence in the record that Commerce could have considered to be sufficient to change its assessment methodology. Cf. Zenith Elecs. Corp. v. United States, 17 CIT 51, 57, 812 F. Supp. 228, 233 (1993) (pointing out that the more Commerce rejects specific evidence in the record, the more likely that its rejection of such specific evidence is unreasonable). Consequently, Commerce's determination that the commissions paid were not at arm's length was reasonable and, therefore, is affirmed.

## VI. Commerce Properly Reallocated NTN's United States and Home-Market Indirect Selling Expenses Without Regard to LOT

### A.    Background

In the review at issue, Commerce calculated NTN's home-market and Unites States expenses without regard to LOT. See Issues & Decision Mem. at 38-39. NTN argued that Commerce should have relied on NTN's reported United States and home-market selling

---

25.   NTN, however, failed to present Commerce with evidence to support its contention that the rates were made at arm's length. NTN did not give Commerce a reason to depart from its usual reasonable methodology, which compares the weighted-average commission rate paid to affiliated parties to the weighted-average rate paid to unaffiliated parties.

expenses based on LOT instead of reallocating these selling expenses without regard to LOT. See id. at 38. NTN maintained that the record provided sufficient evidence that selling expenses varied across LOT, and that Commerce's allocation should reflect the different LOT. See id. NTN additionally argued that Commerce, in a previous review, found its allocation of expenses across LOT acceptable and necessary to prevent distortion. See id. at 38-39.

Timken, in turn, contended that Commerce had rejected NTN's arguments in previous reviews. See id. at 39. Additionally, Timken asserted that NTN "did not provide evidence that it incurred its selling expenses in the manner in which it allocated the expenses." Id. Consequently, Timken concluded that Commerce should not alter its methodology of reallocating NTN's home-market and United States selling expenses without regard to LOT. See id. Commerce responded by stating that it did not dispute that selling expenses differed between NTN's LOT. See id. For the Preliminary Results, 65 Fed. Reg. at 18,033, Commerce reallocated NTN's packing expenses to calculate expenses that more accurately reflected NTN's commercial situation. See id. Commerce, however, found that NTN's methodology for allocating expenses to each LOT did not bear a relationship to the manner in which NTN incurred these United States and home-market selling expenses and its methodology led to distorted allocations. See id. Commerce stated that NTN did not

change its methodology, which it had rejected in prior reviews, and did not present "any evidence that it incurred the selling expenses in the manner in which it allocated the expenses." Id.

### B.    Contentions of the Parties

NTN contends that Commerce erred in reallocating NTN's reported United States selling expenses without regard to LOT. See NTN's Mem. at 26-30. Specifically, NTN argues that the reallocation of such expenses voids Commerce's determination that there were varying LOT in the United States and Japanese markets. See id. at 27. NTN asserts that Commerce's methodology, which does not take into account LOT, is more distortive than NTN's methodology. See id. at 28. NTN concludes that Commerce's reallocation of NTN's United States selling expenses violates Commerce's mandate to administer the antidumping duty laws. See id. NTN asserts that Commerce did not provide an explanation for its decision and "should explain what it did and why it decided on a certain rationale." Id. at 29. NTN maintains that Commerce's reallocation distorts NTN's dumping margin and is inconsistent with record evidence. See id.

Commerce responds that it properly reallocated NTN's United States and home-market selling expenses without regard to LOT. See Def.'s Mem. at 39-42. Commerce maintains that it previously explained, in Final Results of Antidumping Duty Administrative

Reviews, Partial Termination of Administrative Reviews, and Revocation in Part of Antidumping Duty Orders of Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, et al., 60 Fed. Reg. 10,900 (Feb. 28, 1995), that "indirect selling expenses are fixed period costs that typically relate to all sales and do not vary according to sales value of the number of employees who allegedly sell each type of merchandise." Def.'s Mem. at 39. Commerce asserts that NTN allocated its indirect selling expenses based on the number of employees at certain regions without showing that it incurred any specific expenses unique to a particular LOT. See id. at 39-40. Citing FAG Kugelfischer Georg Schafer AG v. United States, 25 CIT ___, ___, 131 F. Supp. 2d 104, 115-20 (2001), NTN 2000, 24 CIT at 409-11, 104 F. Supp. 2d at 133, NTN 1999, 23 CIT at 496-97, 83 F. Supp. 2d at 1290-91, and NTN 1995, 19 CIT at 1231-35, 905 F. Supp. at 1093-95, Commerce asserts that the Court has upheld Commerce's reallocation of NTN's United States and home-market indirect selling expenses without regard to LOT. See Def.'s Mem. at 40-41.

Timken generally supports Commerce's arguments and maintains that record evidence supports Commerce's decision to reject NTN's United States and home-market allocations. See Timken's Resp. at 38-41. Timken asserts that the Court has consistently affirmed Commerce's repeated rejection of NTN's methodology for reporting

indirect selling expenses on the basis of LOT. See id. at 38. Timken maintains that "NTN says nothing new here to call Commerce's position into question . . . [n]or does NTN demonstrate that its allocation methodology does not result in 'distorted allocations.'" Id. at 39.

### C. Analysis

The Court disagrees with NTN that it adequately supported its LOT adjustment claim for its reported United States indirect selling expenses. Although NTN purports to show that it incurred different selling expenses at different LOT, a careful review of the record demonstrates that NTN's allocation methodology does not reasonably quantify the United States indirect selling expenses incurred at each LOT to support such an adjustment. See NTN 1999, 23 CIT at 497, 83 F. Supp. 2d at 1290-91; NTN 1995, 19 CIT at 1234, 905 F. Supp. at 1095. Given that NTN had the burden before Commerce to establish its entitlement to an LOT adjustment, its failure to provide the requisite evidence compels the Court to conclude that it has not met its burden. NTN has failed to demonstrate that Commerce's denial of the LOT adjustment was unsupported by substantial evidence and not in accordance with law. See NSK, 190 F.3d at 1330. Consequently, the Court sustains Commerce's reallocation of NTN's United States indirect selling expenses without regard to LOT.

With respect to Commerce's reallocation of NTN's home-market indirect selling expenses, the Court remands this matter to Commerce. Commerce is instructed to articulate how the record supports Commerce's decision in the <u>Final Results</u>, Fed. Reg. 49,219, to recalculate NTN's home-market indirect selling expenses without regard to LOT.

**VII. Commerce Properly Included NTN's Sample Sales and Sales with High Profits in the Calculation of NV**

**A.   Statutory Background**

Section 1677b(a)(1)(B)(i) of Title 19 of the United States Code states that NV is to be based upon "the price at which the foreign like product is first sold . . . in the ordinary course of trade." "Ordinary course of trade" is defined as "the conditions and practices which, for a reasonable time prior to the exportation of the subject merchandise, have been normal in the trade under consideration with respect to merchandise of the same class or kind." 19 U.S.C. § 1677(15). Furthermore, the statute states that Commerce "shall consider the following sales and transactions, among others, to be outside the ordinary course of trade: (A) Sales disregarded under section 1677b(b)(1) of this title. (B) Transactions disregarded under section 1677(b)(f)(2) of this

title."[9]  Id.

The statute does not define what "among others" means nor does it indicate the criteria Commerce is to use in deciding what sales are outside the ordinary course of trade.  See id.  The SAA, however, states that, "Commerce may consider other types of sales or transactions to be outside the ordinary course of trade when such sales or transactions have characteristics that are not ordinary as compared to sales or transactions generally made in the same market."  H.R. Doc. No. 103-465, at 834, reprinted in 1994 U.S.C.C.A.N. at 4171.  The SAA proceeds to give several examples of such sales and transactions, including "merchandise produced according to unusual product specification, [and] merchandise sold at aberrational prices."  Id.  The SAA also states that the statute does not provide an exhaustive list, yet "the Administration intends that Commerce will interpret [19 U.S.C. § 1677(15)] in a manner which will avoid basing normal value on sales which are extraordinary for the market in question, particularly when the use of such sales would lead to irrational or unrepresentative results."  Id.

---

[9]  Section 1677b(b)(1) deals with below-cost sales. See 19 U.S.C. § 1677b(b)(1) (1994). Section 1677b(f)(2) addresses how transactions between directly or indirectly affiliated persons are to be treated. See 19 U.S.C. § 1677b(f)(2).

Commerce's regulations also provide examples of sales outside the ordinary course of trade. See 19 C.F.R. § 351.102(b) (1999). The regulations state that Commerce may consider "sales or transactions involving off-quality merchandise or merchandise produced according to unusual product specifications, merchandise sold at aberrational prices or with abnormally high profits" to be outside the ordinary course of trade. See id..

Section 1677b(e)(2)(A) of Title 19 of the United States Code states that CV "shall be an amount equal to the sum of . . . the actual amounts incurred and realized by the specific exporter or producer being examined . . . for profits, in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country . . . ."

### B. Background

During the review, NTN argued that its home-market sample sales and sales with high profits were outside the ordinary course of trade. Consequently, it was NTN's position that these sales should have been excluded in Commerce's calculation of NV. See Issues & Decision Mem. at 46-47. NTN asserted that the provision regarding "ordinary course of trade" is meant to prevent sales that do not represent home-market practices from being used to calculate dumping margins. See id. NTN argued that its customer had specifically requested the samples to be used only for testing

purposes. See id. at 46. Additionally, NTN claimed that it provided Commerce with evidence that its high-profit sales were not representative of other sales in the market and, therefore, outside the course of ordinary trade. See id. at 47.

Timken maintained that the data submitted by NTN comparing the price and quantity of sample sales versus normal sales did not provide enough contrast to support NTN's claim. See id. at 46. Furthermore, Timken asserted that NTN did not provide evidence, other than profit levels, demonstrating that its high-profit sales were an aberration. See id. at 47. Consequently, Timken argued that Commerce should not exclude NTN's sample and high-profit sales from its NV calculation. See id. at 46-47.

Commerce rejected NTN's claim and stated that NTN failed to meet its burden of demonstrating that the sample sales were outside the ordinary course of trade. See id. at 46. Commerce reasoned that "the fact that these sales are used for testing purposes does not, in and of itself, demonstrate that the sales are outside the ordinary course of trade." Id. Commerce determined that "in this case, NTN Japan has not shown that its sample sales are in any way unrepresentative of its other sales." Id. Commerce stated that "in order to determine that a sale is outside the ordinary course of trade due to abnormally high profits, there must be unique and unusual characteristics related to the sales in question which make

them unrepresentative of the home market." Id. at 47.

### C. Contentions of the Parties

#### 1. NTN's contention

NTN complains that its sample sales were outside the course of ordinary trade and that Commerce should have excluded such sales in its calculation of NV. See NTN's Mem. at 30-37. NTN maintains that its sample sales "were specifically requested as samples from the customers and are used only for testing purposes as opposed to the normal use of bearings."[10] Id. at 30-31. NTN complains that Commerce acknowledged that these sales were relatively few in number, but then found that NTN's sample sales were not rare or uncommon. See id. at 31. NTN argues that "the defining factor for determining whether something is rare or unusual should not be the total number of sample sales, but rather the relative number of sample sales as compared to overall sales." Id. (emphasis in original). NTN contends that following Commerce's logic would lead to the inaccurate conclusion "that samples for small companies are few in total number and are therefore, 'rare or unusual,' even if the ratio of samples to total sales was the same as NTN's ratio." Id.

---

[10]    NTN adds that these sales were frequently made for higher prices and lower quantities than their normal sales to customers. NTN's Mem. at 31.

NTN asserts that "the ordinary course of trade inquiry is strictly a question of fact," and that NTN's home-market sample sales are not representative of its market sales or ordinary sales profit level. Id. at 32. NTN also argues that the inclusion of NTN's high-profit sales "destroys the utility of the ordinary course of trade provisions," because they are not representative of home-market sales. Id. at 35. Consequently, NTN concludes that Commerce's decision to include NTN's high-profit sales in its NV calculation is contrary to law. See id. at 30-36. Moreover, based on this contention, NTN complains that Commerce erred in including such sales in calculating CV profit. See id. at 36-37. NTN argues that the sales with high profits are ineligible under 19 U.S.C. § 1677b(e)(2)(A) and should have been excluded from Commerce's CV profit calculation. See id.

### 2. Commerce's contentions

Commerce responds that it properly included NTN's sample sales and sales with high profits in calculating NV. See Def.'s Mem. at 42-51. Commerce asserts that the labeling of sales as sample sales that are "in small quantities does not require Commerce to treat them as sales made outside the ordinary course of trade absent a demonstration that the sales possessed some unique and unusual characteristics which made them unrepresentative of the home market." Id. at 49. Commerce maintains that NTN failed to meet

its burden of demonstrating that the sample sales were unrepresentative of its other sales and therefore outside the ordinary course of trade. See id. The fact that the samples were used for testing by the customers that bought them does not, by itself, establish that Commerce is required to treat the sales as sales made outside the ordinary course of trade. See id.

Commerce also asserts that 19 U.S.C. § 1677b(e)(2)(A) "requires that Commerce use amounts incurred for profits in connection with the production and sale of a foreign like product, in the ordinary course of trade." See id. at 50. Commerce, however, claims that it has discretion in determining which sales are outside the ordinary course of trade and that it properly exercised such discretion in the case at bar. See id. at 50-51. For Commerce to determine that sales are outside the ordinary course of trade, there must have been unique and unusual characteristics related to the sales that make them unrepresentative. See id. at 51 (citing Issues & Decision Mem. at 46-47). Commerce maintains that, as it has stated in previous reviews, high profits alone are not sufficient evidence for Commerce to determine that sales are outside the ordinary course of trade. See id. (citing Issues & Decision Mem. at 47). Based on the evidence NTN submitted, Commerce determined that the sales were not aberrational and, therefore, included them in its calculation

of NV and CV profit.  See id.

### 3.  Timken's contentions

Timken agrees with Commerce and argues that NTN did not sufficiently support its claim that its sample sales were not in the ordinary course of trade.  See Timken's Resp. at 43-44. Additionally, Timken supports Commerce's decision to include NTN's high-profit sales in the calculation of NV and CV profit.  See id. at 45-46.

### D.  Analysis

Commerce is required to consider below-cost sales and affiliated party transactions as outside the ordinary course of trade.  See 19 U.S.C. § 1677(15).  The "among others" language of 19 U.S.C. § 1677(15), however, indicates that subsection (A) and (B) are not inclusive.  Commerce has been given the discretion to interpret § 1677(15) to determine which sales are outside the ordinary course of trade.  See Mitsubishi Heavy Indus., Ltd. v. United States, 22 CIT 541, 568, 15 F. Supp. 2d 807, 830 (1998) (noting that "Congress granted Commerce discretion to decide under what circumstances highly profitable sales would be considered to be outside of the ordinary course of trade."); cf. Koenig & Bauer-Albert AG v. United States, 22 CIT 574, 589 n.8, 15 F. Supp. 2d 834, 850 n.8 (1998) (stating that Commerce has discretion to decide

when highly profitable sales are outside the ordinary course of trade, but also noting that Commerce cannot impose this requirement arbitrarily, nor impose impossible burdens of proof on claimants) (citing NEC Home Elecs. v. United States, 54 F. 3d 736, 745 (Fed. Cir. 1995) (holding that the burden imposed to prove a LOT adjustment was unreasonable because claimant could, under no practical circumstances, meet the burden)).

In resolving questions of statutory interpretation, the Chevron test requires this Court first to determine whether the statute is clear on its face. See Chevron, 467 U.S. at 842-43. If the language of the statute is clear, then this Court must defer to Congressional intent. See id. When the statute is unclear, however, the Court must decide whether the agency's answer is based on a permissible construction of the statute. See id. at 843; see also Corning Glass Works v. United States Int'l Trade Comm'n, 799 F. 2d 1559, 1565 (Fed. Cir. 1986) (finding that the agency's definitions must be "reasonable in light of the language, policies and legislative history of the statute"). The statutory provision defining what is considered outside the ordinary course of trade is unclear. The statute specifically defines "ordinary course of trade," yet the statute provides little assistance in determining what is outside the scope of that definition. The statute merely identifies a non-exhaustive list of situations in which sales or

transactions are to be considered outside the "ordinary course of trade."

Accordingly, the Court finds the statute to be ambiguous as to what constitutes a sale outside the ordinary course of trade. What Congress intended to exclude from the "ordinary course of trade" is also not immediately clear from the statute's legislative history. The SAA states that in addition to the specific types of transactions to be considered outside the ordinary course of trade, "Commerce may consider other types of sales or transactions to be outside the ordinary course of trade when such sales or transactions have characteristics that are not ordinary as compared to sales or transactions generally made in the same market." H.R. Doc. 103-465, at 834, reprinted in 1994 U.S.C.C.A.N. 4171. The SAA also states that "the Administration intends that Commerce will interpret [19 U.S.C. § 1677(15)] in a manner which will avoid basing normal value on sales which are extraordinary for the market in question, particularly when the use of such sales would lead to irrational or unrepresentative results." Id. Consequently, the Court finds the legislative history ambiguous as to what constitutes a sale outside the ordinary course of trade.

The lack of guidance of both the statutory language and the legislative history regarding what is considered to be outside the "ordinary course of trade" requires the Court to assess the

agency's interpretation of the provision, as codified by the regulation, to determine whether the agency's interpretation is reasonable and in accordance with the legislative purpose. See Chevron, 467 U.S. at 843. "In determining whether Commerce's interpretation is reasonable, the Court considers, among other factors, the express terms of the provisions at issue, the objectives of those provisions and the objectives of the antidumping scheme as a whole." Mitsubishi, 22 CIT at 545, 15 F. Supp. 2d at 813. The purpose of the ordinary course of trade provision is "to prevent dumping margins from being based on sales which are not representative" of the home market. Monsanto Co. v. United States, 12 CIT 937, 940, 698 F. Supp. 275, 278 (1988). In determining whether sales are outside the "ordinary course of trade," Commerce has examined the totality of the circumstances surrounding the sale or transaction in question. Commerce's regulation states that, "sales or transactions [may be considered] outside the ordinary course of trade if . . . based on an evaluation of all of the circumstances particular to the sales in question, [] such sales or transactions have characteristics that are extraordinary for the market in question." 19 C.F.R. § 351.102(b).

Commerce's methodology allows it, on a case-by-case basis, to examine all conditions and practices which may be considered

ordinary and determine which sales or transactions are, therefore, outside the ordinary course of trade. In light of the statute's legislative purpose and Commerce's interpretation of the statute, the Court finds that Commerce reasonably exercised its discretion in requiring NTN to provide evidence that its sample and high-profit level sales were outside the ordinary course of trade. The Court finds that the labeling of the relevant sales as sample sales do not support NTN's claim that the sales were outside the ordinary course of trade. Cf. Bergerac, N.C. v. United States, 24 CIT 525, 537-39, 102 F. Supp. 2d 497, 509-10 (2000). Furthermore, NTN did not provide sufficient evidence to support its claim that the high-profit sales were not representative of the home market.

Determining whether a sale or transaction is outside the ordinary course of trade is a question of fact in which Commerce considers the totality of the circumstances and not simply one factor. See CEMEX, S.A. v. United States, 133 F.3d 897, 901 (Fed. Cir. 1998); Bergerac, 24 CIT at 538, 102 F. Supp. 2d at 509. Here, NTN relies on only one factor, profit levels, to support its contention that Commerce should have excluded certain sales from its NV and CV profit calculations. NTN's failure to demonstrate that certain sales possessed some unique and unusual characteristic making them unrepresentative of the home market allowed Commerce to reasonably determine that these sales were not outside the ordinary

course of trade.  See NSK Ltd. v. United States ("NSK 2003"), 27 CIT ___, ___, 245 F. Supp. 2d 1335, 1360-61 (2003); NTN 2000, 24 CIT at 427-29, 104 F. Supp. 2d at 145-47.  Accordingly, Commerce's decision to include sample sales and sales with high profits in its calculation of NV and CV profit is affirmed.

**VIII.     Commerce's Treatment of Inputs Obtained from Affiliated Parties in Calculating Cost of Production and CV**

   **A.     Statutory Background**

Whenever Commerce has "reasonable grounds to believe or suspect that sales of the foreign like product under consideration for the determination of [NV] have been made at prices which represent less than the cost of production of that product, [Commerce] shall determine whether, in fact, such sales were made at less than the cost of production."  19 U.S.C. § 1677b(b)(1).  A "reasonable ground" exists if Commerce disregarded below-cost sales of a particular exporter or producer from the determination of NV in the most recently completed administrative review.  See 19 U.S.C. § 1677b(b)(2)(A)(ii).  If Commerce determines that there are sales below the cost of production ("COP") and certain conditions are present under § 1677b(b)(1)(A)-(B), it may disregard such below-cost sales in the determination of NV.  See 19 U.S.C. § 1677b(b)(1).

Additionally, the special rules for the calculation of COP or CV provide that, in a transaction between affiliated parties, as defined in 19 U.S.C. § 1677(33), Commerce may disregard either the transaction or the value of a major input. See 19 U.S.C. § 1677b(f)(2)-(3) (1994). Section 1677b(f)(2) provides that Commerce may disregard a transaction with an affiliated party when "the amount representing [the transaction or transfer price] does not fairly reflect the amount usually reflected in sales of merchandise under consideration in the market under consideration." If such "a transaction is disregarded . . . and no other transactions are available for consideration," Commerce shall value the cost of an affiliated-party input "based on the information available as to what the amount would have been if the transaction had occurred between [unaffiliated persons]." Id.

Section 1677b(f)(3) provides that Commerce may calculate the value of the major input on the basis of the data available regarding COP, if such COP exceeds the market value of the input calculated under § 1677b(f)(2). One of the elements of value to be considered in the calculation of COP, which is referred to in section 1677b(f)(2), is the cost of manufacturing and of fabrication. See 19 U.S.C. § 1677b(b)(3)(A). Commerce, however, may rely on the data available only if: (1) a transaction between affiliated parties involves the production by one of such parties

of a "major input" to the merchandise produced by the other and, in addition, (2) Commerce has "reasonable grounds to believe or suspect" that the amount reported as the value of such input is below the COP.  See 19 U.S.C. § 1677b(f)(3).  For purposes of section 1677b(f)(3), Commerce's regulation provides that Commerce will value a major input supplied by an affiliated party based on the highest of (1) the actual transfer price for the input; (2) the market value of the input; or (3) the COP of the input.  See 19 C.F.R. § 351.407(b) (1999).

### B.    Background

During the review at issue, Commerce used the higher of the transfer price or the actual cost in calculating COP and CV in situations involving inputs that NTN had obtained from affiliated producers.  See Issues & Decision Mem. at 54.  NTN argued that Commerce should have used the transfer prices of the affiliated-party inputs NTN reported because there was no evidence that such prices "did not fairly reflect the amount usually reflected in the sales of merchandise under consideration."  Id.  NTN further asserted that Commerce did not have reasonable grounds to believe that the inputs were sold at less than the COP. See id.  Timken replied that Commerce had rejected NTN's argument in previous reviews and that NTN had not adequately explained how the evidence in the current review differed.  See id.

Commerce responded that pursuant to section 1677b(f)(3) it "may consider whether the amount represented as the value of the major input is less than its COP." Id. Commerce further maintained that it "considers the initiation of a cost investigation concerning home-market sales a specific and objective reason to believe or suspect that the transfer price from a related party for any element of value may be below the related supplier's COP." Id. Consequently, Commerce found it "appropriate to consider the cost data available on the record in determining how to value major inputs." Id.

C.    Contentions of the Parties

NTN complains that Commerce's adjustments to NTN's COP and CV are erroneous. NTN asserts that there are only two grounds on which Commerce could have made its decision, but that neither is applicable to NTN's situation. See NTN's Mem. at 37. NTN argues that 19 U.S.C. § 1677b(f)(2) does not apply because "there is no evidence that the affiliated party inputs did not 'fairly reflect the amount usually reflected in the sales of merchandise under consideration.'" Id. (quoting 19 U.S.C. § 1677b(f)(2)). NTN maintains that the statute does not reference costs. Accordingly, an input sold at less than its COP may reflect the input's fair market price. See id. at 37-38. NTN further contends that the application of 19 U.S.C. § 1677b(f)(3) is only permitted for "major

inputs." See id. at 38. NTN states that in the preliminary results Commerce did not discriminate between major and minor inputs but rather applied its methodology to both types of inputs from an affiliated party. See id. Additionally, NTN complains that Commerce improperly applied the "major input rule" to the production processes performed by NTN's affiliated producers. See id. at 37.

Commerce responded that it properly disregarded transfer price for inputs that NTN purchased from affiliates in its calculation of CV and COP. See Def.'s Mem. at 52-57. Commerce states that the Court has upheld Commerce's rejection of transfer price for inputs purchased from related suppliers, "if the transfer price or any element of value does not reflect its normal value." Id. at 53-54 (citing Timken Co. v. United States, 21 CIT 1313, 1327-28, 989 F. Supp. 234, 246-47 (1997)). Commerce points out that in NSK Ltd. v. United States ("NSK 1995"), 19 CIT 1319, 1323-26, 910 F. Supp. 663, 668-70 (1995), aff'd, 119 F.3d 16 (Fed. Cir. 1997), the Court "upheld Commerce's authority to request cost data concerning parts purchased from related suppliers without a specific and objective basis for suspecting that the transfer prices were below cost . . . ." Def.'s Mem. at 54.

In determining whether transaction prices between affiliated parties are at arm's length and fairly reflect the market prices,

Commerce's practice is to compare the transaction prices with the prices charged by unrelated parties. See id. To value a major input purchased from an affiliated supplier, Commerce uses the highest of the transfer price between the affiliated parties, the market price between unaffiliated parties, or the affiliated supplier's COP for the major input. See id. at 55. Commerce argues that it has reasonably interpreted 19 U.S.C. § 1677b(f)(3) as allowing "it to analyze COP data for major inputs purchased by a producer from its affiliated suppliers when it initiates a COP investigation pursuant to 19 U.S.C. § 1677b(1) without a separate below-COP allegation with respect to inputs." Id. at 55-56; see, e.g., Final Results of Antidumping Duty Administrative Review on Silicomanganese From Brazil ("Final Results Brazil"), 62 Fed. Reg. 37,869, 37,871-72 (July 15, 1997).

Commerce deduces that the affiliation between the respondent and its suppliers "creates the potential for companies to act in a manner other than at arm's length" and gives Commerce reason to analyze the transfer prices for major inputs. Final Results Brazil, 62 Fed. Reg. at 37,871; see also Mannesmannrohren-Werke AG v. United States, 23 CIT 826, 836-37, 77 F. Supp. 2d 1302, 1312 (1999) (holding that 19 U.S.C. § 1677b(f)(2) and (3), as well as the legislative history of the major input rule, support Commerce's decision to use the highest of transfer price, cost of production,

or market value to value the major inputs that the producer purchased from the affiliated supplier). Commerce further argues that the Court in <u>Torrington Co.</u>, 25 CIT at ___, 146 F. Supp. 2d at 869, upheld Commerce's application of the major input rule to production processes. <u>See</u> Def.'s Mem. at 57. Commerce maintains that the Court should affirm its application of the major input rule for the calculation of NTN's CV and COP. <u>See</u> <u>id.</u> at 52-57. Commerce, however, concedes that it did not distinguish between "major" and "minor" inputs. <u>See</u> <u>id.</u> at 57. Consequently, Commerce requests the Court remand this issue for Commerce to explain the reasons for its treatment of certain inputs, apply the major input rule where appropriate and open the record for additional information if necessary. <u>See</u> <u>id.</u>

Timken generally agrees with Commerce that it was proper for Commerce to apply the major input rule in the calculation of CV and COP. Timken's Resp. at 49-51. Timken contends that "Commerce properly made an adjustment to NTN's COP and CV data only in the instances where the affiliated supplier's COP for inputs used to manufacture the merchandise under review was higher than the transfer price." <u>Id.</u> at 50. Timken requests that Commerce's action be affirmed without further remand. <u>See</u> <u>id.</u>

**D.    Analysis**

NTN complains that Commerce "offered no persuasive explanation or statutory support for not using NTN's reported actual costs," and used the major input rule with respect to processes that were performed by NTN's affiliated producers.  See NTN's Mem. at 37. NTN, however, does not adequately substantiate its assertion that it is unreasonable for Commerce to apply the major input rule to affiliated party transactions involving production processes. Furthermore, in Torrington Co., 25 CIT at ___, 146 F. Supp. 2d at 869, the Court upheld Commerce's application of the major input rule to processes performed by NTN's affiliated producers.[11] Accordingly, the Court sustains Commerce's application of the major input rule to production processes as reasonable. See Chevron, 467 U.S. at 837.

Pursuant to section 1677b(f)(2) and (3) of Title 19 of the United States Code, in calculating COP and CV, Commerce is

---

[11]    The Court sustained Commerce's explanation that 19 U.S.C. § 1677b(f)(3) "directs [Commerce] to examine the costs incurred for transactions between affiliated [parties].  These transactions may involve either the purchase of materials, subcontracted labor, or other services.  Thus, [Commerce] applied the major-input rule properly to the production processes performed by [NTN's] affiliates." Final Results of Antidumping Duty Administrative Reviews on Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Romania, Sweden, and the United Kingdom ("Final Results 1999"), 64 Fed. Reg. 35,590, 35,612 (July 1, 1999)(citation omitted).

authorized to: (1) disregard a transaction between affiliated parties if, in the case of any element of value that is required to be considered, the amount representing that element does not fairly reflect the amount usually reflected in sales of merchandise under consideration in the market under consideration; and (2) determine the value of the major input on the basis of the information available regarding COP, if Commerce has reasonable grounds to believe or suspect that an amount represented as the value of the input is less than its COP.  See Timken Co., 21 CIT at 1327-28, 989 F. Supp. at 246 (holding that Commerce may disregard transfer price for inputs purchased from related suppliers pursuant to 19 U.S.C. § 1677b(e)(2), the predecessor to 19 U.S.C. § 1677b(f)(2), if the transfer price or any element of value does not reflect its NV) (citing NSK 1995, 19 CIT at 1323-26, 910 F. Supp. at 668-70).[12]  The Court has recently held that if Commerce was provided with sufficient evidence to differentiate between "major" and "minor" inputs, then "it was Commerce's obligation to either: (1) exclude 'minor' inputs from the reach of Commerce's methodology reserved

---

[12]    In NSK 1995, 19 CIT at 1323-26, 910 F. Supp. at 668-70, this Court upheld Commerce's authority to request cost data concerning parts purchased from related suppliers without a specific and objective basis for suspecting that the transfer prices were below-cost because section 1677b(e)(2) grants Commerce authority to request information concerning "any element of value required to be considered" and section 1677b(e)(3) does not limit Commerce's authority to request COP data pursuant to section 1677b(e)(2).  See id.

for 'major' inputs; or (2) articulate why Commerce's 'major input'

methodology is equally applicable to 'minor' or any inputs."  NSK

Ltd. v. United States, 26 CIT __, __, 217 F. Supp. 2d 1291, 1322

(2002).

        Commerce concedes that it failed to discriminate between major

and minor inputs.  Consequently, the Court remands this issue to

Commerce to clarify the reasons for its treatment of inputs, to

apply the major input rule were appropriate, and to open the record

for additional information if necessary.


**IX.  Commerce Properly Based NV Upon CV After Disregarding Below-
      Cost Identical and Similar Merchandise**

   **A.    Statutory Background**

Normal Value means "the price at which the foreign like

product is first sold . . . for consumption in the exporting

country, in the usual commercial quantities and in the ordinary

course of trade" at a time reasonably corresponding to the time of

the sale used to determine the EP or CEP under 19 U.S.C. §

1677a(a).  See 19 U.S.C. § 1677b(a)(1)(B)(i).  The term "foreign

like product" is defined as:

>     merchandise in the first of the following categories in
>     respect of which a determination . . . can be
>     satisfactorily made:
>
>     (A)  The subject merchandise and other merchandise which
>          is identical in physical characteristics with, and

was produced in the same country by the same person as, that merchandise.

(B)   Merchandise--

(i) produced in the same country and by the same person as the subject merchandise,

(ii) like that merchandise in component material or materials and in the purposes for which used, and

(iii) approximately equal in commercial value to that merchandise.

(C)   Merchandise--

(i) produced in the same country and by the same person and of the same general class or kind as the [subject] merchandise,

(ii) like that merchandise in the purposes for which used, and

(iii) which the administering authority determines may reasonably be compared with that merchandise.

19 U.S.C. § 1677(16).


"Ordinary course of trade" means "the conditions and practices which, for a reasonable time prior to the exportation of the subject merchandise, have been normal in the trade under consideration with respect to merchandise of the same class or kind."  19 U.S.C. § 1677(15).  Commerce shall consider sales and transactions, among others, to be outside the ordinary course of trade if: (1) the sales are disregarded under 19 U.S.C. 1677b(b)(1), or (2) transactions are disregarded under section 1677b(f)(2).  See id.

**B.    Contentions of the Parties**

NTN complains that Commerce, based on its reading of <u>CEMEX</u>, 133 F.3d at 903-04, improperly calculated NV based on CV after determining that both identical and similar merchandise were disregarded as below cost.  <u>See</u> NTN's Mem. at 38.  Specifically, NTN contends that Commerce's methodology is inconsistent with the current statutory scheme and that Commerce should have followed "its pre-<u>CEMEX</u> methodology of using CV in situations where the 'like product' is disregarded as below cost."  <u>Id.</u>  Concentrating upon 19 U.S.C. § 1677b(a)(1)(B), NTN argues that in defining the foreign like product, Commerce "must first determine whether there is identical merchandise.  If there is identical merchandise, 'foreign like product' has been identified, and that analysis ends."  <u>Id.</u> at 39.  NTN asserts that Commerce is required to use sales of this merchandise in the calculation of NV, "provided they are in the 'usual commercial quantities and in the ordinary course of trade.'"  <u>Id.</u>

NTN argues that when sales of the foreign like product are less than the COP, Commerce must, pursuant to 19 U.S.C. § 1677b(b)(1), disregard such sales from its calculation of NV.  <u>See</u> <u>id.</u>  NTN asserts that "if no sales made in the ordinary course of trade remain, the normal value shall be based on constructed value of the merchandise."  NTN's Mem. at 38 (quoting 19 U.S.C. §

1677b(b)(1)). NTN complains that Commerce identified the foreign like product and disregarded certain below cost sales, and that Commerce then "attempted to label another type of merchandise as the 'foreign like product.'" Id. at 40. NTN contends that Commerce, "by redefining the foreign like product rather than using the statutory requirement of CV has acted contrary to the statute in its NV calculation." Id.

Commerce responds that it properly did not resort to CV when sales of identical merchandise were disregarded as below-cost sales. See Def.'s Mem. at 57-64. Commerce asserts that 19 U.S.C. § 1677b(b)(1) authorizes Commerce to disregard below-cost sales because they are not in the ordinary course of trade. See id. at 59-60. Under the pre-URAA law, when sales of identical merchandise have been found to be outside the ordinary course of trade, the plain language of 19 U.S.C. § 1677(16) (1988) requires Commerce to base foreign market value (currently referred to as NV under the post-URAA law) on non-identical but similar merchandise, rather than upon CV. See Def.'s Mem. at 59-60 (citing CEMEX, 133 F.3d at 904). Commerce argues that 19 U.S.C. § 1677(15) mandates that Commerce consider below-cost sales which it has disregarded as outside the ordinary course of trade pursuant to 19 U.S.C. 1677b(b)(1). See id. at 61.

Commerce has interpreted the statutory scheme as requiring the consideration of similar foreign like product sales if such sales are disregarded as below-cost sales. See id. (citing Final Results 1999, 64 Fed. Reg at 35,614-15). Furthermore, Commerce uses CV for determining NV only if it also disregards sales of the similar like product because they are below cost. See id. (citing Final Results 1999, 64 Fed. Reg at 35,614-15).

Commerce's position is shared by Timken. Timken asserts that Commerce properly calculated NV based on sales of identical or similar merchandise before resorting to CV in instances where below-cost sales were disregarded. See Timken's Resp. at 51-53.

## C. Analysis

The Court disagrees with NTN and finds that the statutory scheme supports Commerce's determination. The pertinent part of 19 U.S.C. § 1677b(a)(1)(B)(i) requires Commerce to base NV upon the price at which the foreign like product is sold for consumption in the exporting country in the ordinary course of trade.[13] The pertinent part of 19 U.S.C. § 1677(15) requires Commerce to consider below-cost sales that Commerce has disregarded pursuant to 19 U.S.C. § 1677b(b)(1) to be outside the ordinary course of trade. In accordance with CEMEX, 133 F.3d at 903-04, Commerce has

_____

[13]    Foreign like product is defined in 19 U.S.C. § 1677(16) as identical or like merchandise.

interpreted the statutory scheme as requiring it to consider sales of similar foreign like product if it has disregarded sales of identical foreign like product as below-cost sales. See Issues & Decision Mem. at 59. Furthermore, Commerce recognizes that it is to use CV for determining NV only if Commerce also disregards sales of similar like product because they are below-cost. See id.

NTN ignores the fact that 19 U.S.C. § 1677b(b)(1) does not define the terms "ordinary course of trade" or "foreign like product." The definitions are provided by 19 U.S.C. § 1677(15) and (16). As the Court has previously stated, "the changes made to the antidumping law by the URAA did not render the CEMEX decision inapplicable." See Torrington Co., 25 CIT at ___, 146 F. Supp. 2d at 873. Under post-URAA law, pursuant to 19 U.S.C. §§ 1677b(a)(l) and 1677(16), Commerce must first look to identical merchandise in matching the United States model to the comparable home-market model. If a determination cannot be satisfactorily made using identical merchandise, Commerce must look to like merchandise — initially under the second category and, if that is not available, under the third category. See Torrington Co., 25 CIT at __, 146 F. Supp. 2d at 873-74; accord CEMEX, 133 F.3d at 903-04.

NTN failed to show why Commerce's interpretation of the aforesaid post-URAA provisions is unreasonable. The mere fact that under post-URAA law Commerce reached a decision analogous to that

reached by the CAFC under pre-URAA law in <u>CEMEX</u> does not render Commerce's determination irrational. <u>See</u> <u>Chevron</u>, 467 U.S. at 842-43. For these reasons, the Court upholds Commerce's decision to resort to CV only if below-cost sales for both identical and similar foreign like product have been disregarded.

### CONCLUSION

This case is remanded to Commerce to: (1) apply the arm's length test, in accordance with 19 C.F.R. § 351.403(c), to the sales prices of the two affiliated resellers to determine whether the sales prices were comparable to the price at which NTN sold the subject merchandise to unaffiliated parties; (2) explain how the record supports its decision to recalculate NTN's home-market indirect selling expenses without regard to LOT; and (3) clarify the reasoning for Commerce's treatment of inputs, and (a) apply the major input rule where appropriate, and (b) open the record for additional information, if found necessary. Commerce is affirmed in all other aspects.

**/s/ Nicholas Tsoucalas**
**NICHOLAS TSOUCALAS**
**SENIOR JUDGE**

Dated:     February 3, 2004
           New York, New York